WIDETT & WIDETT[1] *vs.* MYRON SNYDER & others.[2]

Suffolk.    March 9, 1984. — August 15, 1984.

Present: WILKINS, LIACOS, NOLAN, & LYNCH, JJ.

*Attorney at Law,* Transaction with client. *Real Property,* Merger. *Mortgage,* Real estate, Assignment. *Fiduciary. Corporation,* Officers and agents.

A defendant was properly held liable on his note payable to a law firm for legal services admittedly rendered by it to a corporation controlled by the defendant and his family, where both the note and a home mortgage securing it, the latter of which had been executed by both the defendant and his wife, were part of an arrangement by financially sophisticated persons, involved no unfairness or overreaching by the law firm, and were not of such a character as would oblige the law firm to apprise the couple of a need for independent legal advice, or to give them advice, concerning the consequences of the arrangement. [780-782]

A purported third mortgage, which was originally granted by a husband and wife to secure the indebtedness of a corporation controlled by the mortgagors' family, and which later, by assignments, was acquired by the couple's son acting as nominee for the wife, was, on equitable principles, correctly treated as extinguished where to treat the mortgage as still in force would work an injustice upon a law firm whose claim for legal services was secured by a subordinate mortgage on the same property. [782-785]

A director of a corporation was properly held liable to the corporation for its expenses in litigation relating to the continuing validity of a certain mortgage, where the director had used the corporation, solely for his own benefit, to secure the assignment of the mortgage to his son without

---

[1] Individual partners of Widett & Widett are also named plaintiffs. Partners of Widett & Widett, with others, formed a new law firm in 1976, but the old firm continued for the purpose of collecting its accounts receivable.

[2] Inez Tedesco Snyder, Robert G. Snyder, G. Ropate Corp., Newbury Prime Realty Corp., Sidney Bornstein, Gerald Bornstein, Phillip Pearl, and Peter Bakis. Each of the last four defendants holds 22½% of the stock of Newbury Prime Realty Corp. (Newbury Prime). These four defendants and Newbury Prime filed cross claims against Myron Snyder.

disclosing to the corporation his personal interest in the transaction or his reasons for attempting to maintain the mortgage in force. [785-786]

The record in a civil action was insufficient to support the trial judge's conclusion that a party was personally liable for repayment of funds which allegedly had been advanced to a corporation for the purpose of enabling it to bid at a bankruptcy sale of certain property owned by a trust in which that party had an interest. [786-787]

CIVIL ACTION commenced in the Land Court Department on July 16, 1981.

Upon transfer to the Superior Court Department, the case was heard by *Randall,* J., a Land Court judge sitting under statutory authority.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Charles F. Choate* for Myron Snyder & others.

*Richard D. Gilman* for Newbury Prime Realty Corp. & others.

*Michael B. Keating* for the plaintiffs.

WILKINS, J. In this appeal, the defendants Myron Snyder (Myron) and Inez Tedesco Snyder (Inez), husband and wife, challenge the following determinations reflected in the judgment: (1) Myron is liable to Widett & Widett (law firm) on a 1977 note payable to the law firm secured by a valid mortgage Myron and Inez gave on their Brookline home; (2) an earlier mortgage of the Brookline property now held for Inez by the defendant Robert G. Snyder, Myron and Inez's son, is void; (3) Myron is liable to the defendant Newbury Prime Realty Corp. for attorney's fees (and to certain of its shareholders for their lost time) related to the defense of this litigation; and (4) Myron is liable to the defendant Sidney Bornstein for $60,100 with interest.[3] We transferred the appeal to this court on our own motion.

---

[3] G. Ropate Corp. and Robert G. Snyder have also appealed. Whatever arguments have been made on their behalf will be disposed of in our treatment of the issues raised by Myron and Inez.

1. *The note and mortgage to the law firm.* From 1970 until a date in December, 1975, the law firm represented G. Ropate Corp. (G. Ropate) in a substantial action brought on its behalf in the United States District Court for the District of Massachusetts. Myron was president, treasurer, and chief executive officer of G. Ropate. The stock of G. Ropate was held by members of the Snyder family. While the action was pending, the law firm submitted bills for its services. Myron gave the law firm assurances that its bills would be paid. By May 16, 1975, G. Ropate had paid the law firm approximately $83,000.

On December 2, 1975, the Federal action was settled by an agreement that the defendant in that action would pay G. Ropate $525,000. On December 12, 1975, a partner in the law firm received a check in that amount payable to G. Ropate. Myron insisted that the check be delivered to him. The law firm initially maintained that its bill for services should be paid out of the proceeds of the check. Ultimately, after assurances by Myron that he would see that the bill was paid within thirty days, the law firm released the check to him. Myron took $25,000 of the proceeds of the check for himself personally, placed part of the proceeds in entities (other than G. Ropate) in which he had interests, and used the balance to discharge various personal and business obligations. The law firm's bill for its services was not paid within thirty days. After negotiations as to the amount of the bill, Myron agreed to a bill of approximately $115,000. G. Ropate thereafter made a partial payment, leaving a balance due of $100,000. No payment was made on this balance during 1976. In the first half of 1977, $30,000 was paid, leaving a balance of $70,000. In June, 1977, a partner in the law firm told Myron that it had decided to commence an action to collect on the balance due. Myron indicated that his enterprises were in financial difficulty and that a law suit would be harmful to his efforts to resolve his problems. The possibility of the law firm's taking a mortgage on the Snyders' Brookline home was discussed. Myron said the Brookline property had two mortgages in the amount of approximately $200,000 but it was worth considerably more. In July, 1977, Myron agreed to sign a note payable to the law

firm providing for monthly payments and payment in full on December 31, 1978, with the note to be secured by a mortgage on the Brookline property. Myron at no time volunteered the information that early in July he and Inez had granted a third mortgage to the Harbor National Bank of Boston (Harbor bank) in the amount of $240,000. The law firm learned of the third mortgage from a title search conducted before the note and mortgage were prepared. The transaction nevertheless went ahead. On September 12, 1977, Myron Snyder signed a note, personally and on behalf of G. Ropate, agreeing to pay the law firm $70,682, with monthly obligations of $2,500 and with the balance due on December 31, 1978. Inez did not sign the note. On the same day, Myron and Inez signed a mortgage on their home in favor of the law firm to secure the obligations of the note. That day Myron gave the law firm a check for $2,682, the only payment ever made on the note. The interest rate on the note was lower than could have been obtained at a bank. After more delay and unfulfilled promises from Myron, the law firm commenced this action in July, 1981.[4]

The judge found that Myron was a very sophisticated business person, particularly as to commercial and real estate transactions. He had signed many notes personally and as a corporate officer. He "knew exactly what he was doing every minute, and he knew the consequences of what he was doing." Inez also knew what she was doing. She signed the mortgage but refused to sign the note, knowing her potential liability if she did. Over the years she had signed many notes and mortgages. The judge ruled that the law firm treated Myron fairly and considerately, although Myron did not so treat the law firm. He ruled that the law firm had not violated its fiduciary duties to Myron and Inez and that the note and mortgage were valid and enforceable.

To recite the judge's findings, which are fully warranted by the evidence, substantially disposes of Myron's and Inez's joint

---

[4] The action was begun in the Land Court. Because there was a question whether the Land Court had jurisdiction over all aspects of the case, the Chief Administrative Justice of the Trial Court transferred the case to the Superior Court in Suffolk County and assigned it to a judge of the Land Court sitting as a Superior Court judge.

claim that the note and mortgage were obtained in violation of the law firm's fiduciary duty to them. We recently stated the law concerning the propriety of transactions between attorneys and clients in *Pollock* v. *Marshall,* 391 Mass. 543, 555-559 (1984). The *Pollock* case involved business transactions between the attorneys and their client. We concluded that the attorneys in the circumstances were not obliged to advise the client to seek independent counsel before he entered into the challenged transaction. *Id.* at 558. We also concluded that the challenged transactions were not unfair to the client. *Id.* at 559. In the case before us, the transaction was not a "business transaction" between attorney and client in the traditional sense. It was an arrangement, made by sophisticated clients, to pay an amount admittedly due the law firm for legal services rendered. There was no unfairness or overreaching by the law firm. In the circumstances, the law firm should not be barred from recovering on the note and having the security of the mortgage. It was not obliged to advise the Snyders to seek independent legal advice or itself to give advice concerning the consequences of the arrangement.

2. In order to deal with the issue of the validity of the purported third mortgage on the Snyders' Brookline home — the recent mortgage which Myron omitted to mention to the law firm prior to the execution of the note and mortgage we have just discussed — we must describe the circumstances under which it was created and then transferred to the Snyders' son Robert.

On July 6, 1977, to resolve problems it had with the Harbor bank, G. Ropate gave a note to that bank, guaranteed by Myron and Inez, who gave as security for their guarantees a mortgage on their Brookline home and a mortgage on property on Newbury Street, Boston, held by them as trustees of the Paul G. Roberts Realty Trust (Roberts trust). In 1979 the Snyders as trustees of the Roberts trust filed a voluntary petition in bankruptcy, and a bankruptcy judge ordered the Newbury Street property to be sold. In circumstances that are important in deciding the issues we shall discuss later, Myron and Inez became involved with the defendants Bakis, Pearl, Gerald

Bornstein, and Sidney Bornstein (the Bornstein group) in a plan by which they (except Myron), through a corporation, would purchase the trust's property on the approval of a bankruptcy judge. As part of the arrangement for the purchase of the Roberts trust property, various secured obligations of the Roberts trust had to be cleared from the title to the Newbury Street property, including the G. Ropate debt to the Harbor bank which had been guaranteed by the Snyders. The Bornstein group executed an agreement with Inez which provided for the formation of Newbury Prime to take title to the former Roberts trust property, and to take assignments of certain notes, mortgages, and guarantees, including the ones relating to the Harbor bank and the Snyders' Brookline property. Newbury Prime was to reassign the notes, mortgages, and guarantees to Inez for $1.00.

At the closing on November 5, 1980, the Harbor bank assigned to Newbury Prime the G. Ropate note to it and the Snyders' guarantee of that note, secured by the mortgage of the Brookline property. That same day Newbury Prime reassigned the note, guarantee, and mortgage to Robert G. Snyder, the son of Myron and Inez, acting as a straw for Inez. Other mortgages on the property were discharged and not assigned, as originally proposed. Newbury Prime and the Bornstein group have made no claim that they have any rights in the G. Ropate note, in the guarantee, or in the third mortgage. Although Sidney Bornstein and Gerald Bornstein, as president and treasurer, respectively, of Newbury Prime executed the assignment to Robert G. Snyder, they have no memory of the assignment among the papers presented to them at a very confusing passing, as the judge described it. Taking the documents at face value, the third mortgage on the Snyders' home secures their guarantee of G. Ropate's note payable to Inez's straw. G. Ropate is wholly owned and controlled by the Snyder family. The Harbor bank would undoubtedly have discharged the G. Ropate debt to it, instead of assigning it, if the Snyders had wished.

The question is whether the third mortgage continues to have validity, and hence priority, over the mortgage given to the law firm. The trial judge ruled that the assignment from the

Harbor bank to Newbury Prime acted as a discharge of the mortgage. We think that conclusion is essentially correct because the third mortgage no longer has a purpose that should be recognized against the law firm on equitable principles. Inez and Myron own the equity in the Brookline property, and she holds the purported third mortgage.

The controlling consideration as to the status of the third mortgage is whether an injustice would be worked by not treating the mortgage as extinguished. See 3 R. Powell, Real Property par. 459, at 696.24-696.25 (P. Rohan ed. 1981). We regard G. Ropate and the Snyders as one for the purpose of deciding this question. Whether one views the purported assignment of the mortgage to Newbury Prime as in fact a release instead of an assignment (see *Carlton* v. *Jackson,* 121 Mass. 592, 596 [1877]; *McCabe* v. *Swap,* 14 Allen 188, 192 [1867]), or whether one views the assignments as merging the Snyders' equity of redemption and the third mortgage, thus extinguishing the mortgage (*McCabe* v. *Swap, id.* at 191), the result is the same. "[A] court of equity will go behind the form to reach the substantial merits of the case." *Ryer* v. *Gass,* 130 Mass. 227, 229 (1881). Although in certain instances we have treated intention as controlling whether a mortgage was extinguished or assigned (see *Flanagan* v. *Babineau,* 332 Mass. 379, 381 [1955]; *Shapiro* v. *Bailen,* 293 Mass. 121, 123 [1936]; *Cheffee* v. *Geageah,* 253 Mass. 586, 589 [1925]; *Gibson* v. *Crehore,* 3 Pick. 475, 482 [1826]), we will not permit intention to control when to do so would be unfair to third persons. See *Lydon* v. *Campbell,* 198 Mass. 29, 33 (1908) ("The mortgage debt having been extinguished by the payment under these circumstances, the owner of the equity could not keep it alive even by causing an assignment to be made, even to a third party who contributed in no way to the payment"); *McCabe* v. *Swap, supra* at 191-192 (Mergers are odious in equity "whenever injustice will be worked thereby. But when a party, for the purpose of defeating a meritorious right in another, sets up . . . a mortgage which it was his duty to pay, equity is equally ready to manifest its aversion to such an attempt; and we think both law and equity coincide in declaring against it . . . .

Accordingly an assignment in form is held to be an extinguishment, when the justice of the case requires it"); 3 R. Powell, *supra* at 696.29; 5 H. Tiffany, Real Property § 1482, at 512 (3d ed. 1939); Swaim, Crocker's Notes on Common Forms §§ 532, 533 (7th ed. 1955).

The Snyders advance no valid reason why the G. Ropate note and mortgage to the Harbor bank were purportedly assigned when other secured debts were discharged. The only apparent purpose was to maintain the mortgage to the law firm in a position subordinate to the third mortgage. The judge was correct in rejecting such an unfair result and in concluding that the third mortgage was null and void.[5]

3. Myron challenges the award to Newbury Prime of an allowance for attorney's fees in this litigation and the award of damages to members of the Bornstein group for their loss of time in defending this action. The judge concluded, on these defendants' cross claims against Myron, that Myron, a director of Newbury Prime, in bad faith violated his fiduciary duty to the corporation in assigning the mortgage on the Brookline property to his son through Newbury Prime without disclosing the circumstances and purpose of the transaction.

We agree that the use of Newbury Prime as a mechanism to transfer the Snyders' guarantee and mortgage to the Harbor bank to Robert G. Snyder was a violation of Myron's fiduciary duty as a director of Newbury Prime. See *American Discount Corp.* v. *Kaitz,* 348 Mass. 706, 711 (1965); *Seder* v. *Gibbs,* 333 Mass. 445, 452-453 (1956); *Winchell* v. *Plywood Corp.,* 324 Mass. 171, 177 (1949). The transfers were solely for the Snyders' benefit and were of no benefit to Newbury Prime. Because of the Snyders' use of this device, Newbury Prime became involved in this litigation when the law firm reasonably named Newbury Prime and its directors as defendants in its challenge to the validity of the third mortgage. This involve-

---

[5] The Snyders make no claim that the assignment of G. Ropate's obligation should survive even if the mortgage is null and void, nor do they claim that the judgment should be modified to state explicitly that the mortgage is null and void only among the parties to this litigation.

ment of Newbury Prime was a foreseeable consequence of Myron's involvement of it in the assignments. See Restatement (Second) of Torts § 874 (1979).

As Myron points out, it is uncontestable that on November 5, 1980, Sidney Bornstein and Gerald Bornstein, as president and treasurer, respectively, of Newbury Prime, executed an assignment to Robert G. Snyder of the G. Ropate note and the Snyders' guarantee secured by their mortgage. The Bornstein group had no knowledge of the significance of that mortgage, although obviously they had agreed to assign notes, mortgages, and guarantees to Inez's nominee, and Sidney and Gerald had knowledge of the assignment of this mortgage. The justification for Myron's liability is his bad faith breach of his duty of loyalty to the corporation in failing adequately to disclose his personal interest in the assignments, which were of no benefit to Newbury Prime, and in using the corporation for his family's personal benefit. Myron was properly held liable for the expenses of the litigation as it related to the continuing validity of the mortgage of the Brookline property.[6]

4. Myron also challenges the judge's conclusion that he owed $60,100 to Sidney Bornstein because Sidney advanced

---

[6] The Snyders make no claim that the amounts awarded in damages include reimbursement for legal services and time expended unrelated to issues involving Myron's breach of his duty of loyalty to the corporation. The law firm was not seeking relief against Newbury Prime or the Bornstein group, except as those defendants might have claimed the G. Ropate note and the Snyders' mortgage and guarantee as assets of Newbury Prime. Because Newbury Prime and the Bornstein group made no such claim, possibly they should have withdrawn from this aspect of this case at an earlier stage than they did, reserving the right to comment on the form of the judgment. Without any indication of the allocation of the attorney's time among the issues in this case, we cannot assess the propriety of the amount allowed and we are not asked to. Certainly the personal claim of Sidney Bornstein against Myron, which we discuss next, is not one as to which Myron would be liable for attorney's fees because of a breach of duty to Newbury Prime. In his discretion, the judge may reconsider this question in determining what attorney's fees to allow Newbury Prime on this appeal.

The Snyders make no separate argument that, if they are liable to Newbury Prime for attorney's fees, they are not liable to members of the Bornstein group for the value of their lost time devoted to the defense of this action.

that amount to Myron who agreed to repay Sidney. The $60,100, which Sidney testified that he paid to the corporation, was a portion of the funds that, by agreement, were to be available to Newbury Prime so that it could bid for the Newbury Street property in the bankruptcy proceedings involving the Roberts trust. There is no evidence that Sidney paid Myron $60,100. Subsequently, Inez paid $60,100 to the corporation in exchange for 10% of the stock of each class in Newbury Prime. It is not established on this record why the corporation received $60,100 both from Sidney and from Inez. It does appear that Sidney has paid $60,100 to the corporation and has received nothing in exchange.[7] The question of Sidney's right to reimbursement must be reconsidered because the evidence does not warrant the judge's finding that Sidney paid $60,100 to Myron.

5. The amended judgment is modified by striking the paragraph stating that Myron Snyder is personally liable to Sidney Bornstein for $60,100 with interest from November 5, 1980, and as so modified is affirmed. The case is remanded for consideration of Sidney Bornstein's claim for $60,100. The judge may award reasonable attorney's fees and expenses with respect to the appeal to Widett & Widett (pursuant to Myron Snyder's obligation to pay the cost of collection of the note) and to Newbury Prime and to the Bornstein group with respect to that portion of the appeal which concerned issues involving Myron Snyder's breach of duty to Newbury Prime.

*So ordered.*

---

[7] Sidney testified that a 70% vote of the shareholders of the corporation would be needed to authorize the corporation to repay him $60,100. He thought he could not vote his 22½% interest because of his personal interest in such a vote. He thought Inez would not vote her 10% in favor of such a vote. We do not have the corporation's by-laws in the record. Sidney's conclusions concerning their operation (or concerning Inez's likely vote) may or may not be correct.