In re DEMAKES ENTERPRISES, INC., Debtor.

DEMAKES ENTERPRISES, INC., Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION as it is the Assignee of Bank of New England, N.A., Defendant.

Bankruptcy No. 91–12666–JNG.
Adv. No. 91–1738.

United States Bankruptcy Court, D. Massachusetts.

June 22, 1992.

Joan N. Feeney, Hanify & King, Boston, Mass., for debtor.

James M. Liston, Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., for defendant.

JAMES A. GOODMAN, Bankruptcy Judge.

## I. Introduction

On December 16, 1991, Demakes Enterprises, Inc. ("Demakes" or the "Debtor") filed an adversary proceeding, seeking to equitably subordinate a portion of the claim of the Federal Deposit Insurance Corporation (the "FDIC"), as the assignee of the failed Bank of New England ("BNE" or the "Bank"). The FDIC responded to the Complaint by moving to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012, based upon the *D'Oench* doctrine and its statutory counterpart, 12 U.S.C. § 1823(e).

## II. Standard for Dismissal [1]

■ In deciding a motion to dismiss, the Court must accept the truth of all well pleaded factual allegations contained in the complaint, giving the plaintiff the benefit of all reasonable inferences. A motion to dismiss must be denied unless it appears that the plaintiff could prove no set of facts in support of its claim that would entitle it to the relief sought. *See Hishon v. King & Spaulding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## III. Demakes' Complaint

In its Complaint, Demakes sets forth the chronology of events leading to the present impasse. What follows is a summary of the allegations in the Complaint.

Demakes is in the meat manufacturing and distributing business and has been for over 75 years. Employing approximately 165 people, it operates its business in Lynn, Massachusetts under the trade names Old Neighborhood Foods and Pleasant Beef. In 1989 and 1990, it enjoyed sales to entities such as Stop & Shop, S.S. Pierce and Harvard University in excess of $30 million per year. Despite the volume of its sales, Demakes sustained net losses of $146,000 and $1,200,000 in 1989 and 1990, respectively.

Demakes had a banking relationship with Bank of New England or its predecessors for over 50 years. In late 1989, it began negotiating with BNE for a loan facility that would include a $1 million line of credit.

---

1. The parties submitted an Amended Joint Statement of Uncontested Facts which does not supplement or materially alter the alleged facts set forth in the Complaint. Accordingly, the Court does not believe this pleading transforms the Motion to Dismiss into a motion for summary judgment.

On December 22, 1989, Demakes and BNE entered into a Revolving Credit Term Loan Agreement (the "1989 Loan Agreement"). In connection with the 1989 Loan Agreement, Demakes executed a Revolving Credit Note in the original principal amount of $1 million (the "Credit Line"), an Equipment Term Loan Note in the original principal amount of $800,000 (the "Equipment Note"), and a Mortgage Term Loan Note in the original principal amount of $2 million (the "Mortgage Note"). The Credit Line, the Equipment Note and the Mortgage Note were secured by all of the Debtor's assets, other than inventory and accounts receivable. The Credit Line matured according to its terms on May 31, 1990.[2]

Demakes alleges that it entered into these loan transactions, and particularly the Credit Line Note, upon the representations of BNE loan officers that the May date was merely a technical formality, and that the Credit Line would automatically be extended.

In late spring and summer of 1990, discussions between BNE officers and Demakes representatives took place concerning the renewal of the Credit Line. Demakes representatives thought an agreement had been reached in June of 1990 when Tim Riley, a BNE loan officer, indicated he accepted a Demakes proposal for an increased credit line in the amount of $1.25 million secured by the company's accounts receivable and the limited guaranties of Demakes' principals.

Despite this apparent agreement, BNE transferred the Demakes file to its loan workout department and reneged on the $1.25 million line of credit. On July 13, 1990, after suggesting terms requiring additional collateral, Fred Lucy ("Lucy"), a workout officer at BNE, agreed to increase the line of credit to $1.25 million, if the Debtor agreed to secure the line with its accounts receivable, and not, as previously suggested, inventory and a mortgage of third party real estate.

On August 22, 1990, more than two months after the Credit Line had matured, Lucy insisted that the Debtor accept the terms of the July proposal or BNE would demand payment on the overdue Credit Line. Despite this ultimatum, negotiations on extending the Credit Line continued until October 4, 1990, when BNE commenced a collection action against the Debtor in which it sought and obtained, on October 5, 1990, an *ex parte* trustee process attachment of the Debtor's bank accounts. The Debtor was served with the complaint on October 9, 1990.

According to the Debtor, BNE's actions in the spring and summer of 1990 were the result of a fundamental change in the collection policies of the Bank, stemming from pressure from federal regulators. Because of the policy changes, Demakes alleges that the actions of BNE loan officers were calculated to put its loan in default and otherwise secure collection.

Moreover, the Debtor alleges that Lucy knew the Debtor was attempting to obtain financing from another lender and that BNE acted in bad faith when it sought the trustee process. As a result of BNE's actions, over 85 checks to vendors and employees bounced, the Debtor's business was disrupted, and its good will and credit standing were undermined in the business community. Additionally, the Debtor alleges it was forced to file the instant bankruptcy petition in response to BNE's notice of its intention to foreclose on the Debtor's property in Lynn.

Through its Complaint and pursuant to section 510(c) of the Bankruptcy Code,[3] the

---

**2.** The Amended Joint Statement of Uncontested Facts contains a maturation date of May 31, 1989. Based upon the chronology of events set forth in the Complaint, the Court concludes that there is a typographical error in the Joint Statement.

**3.** Section 510(c) provides:
Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.
11 U.S.C. § 510(c).

Debtor seeks the equitable subordination of BNE's deficiency claim. The Debtor estimates this claim to be $3.1 million (BNE's total claim of approximately $4.4 million less its estimated allowed secured claim of $1.3 million).[4]

## IV. Discussion

The FDIC argues that the Debtor's Complaint fails to state a claim because the *D'Oench* doctrine bars the assertion of inequitable conduct claims against the FDIC. The FDIC emphasizes that the Debtor's Complaint contains no allegations that there was any agreement to extend the Credit Line that was 1) in writing; 2) executed by BNE and the Debtor; 3) approved by BNE's Board of Directors or its Loan Committee; or 4) found in the official records of BNE.

The *D'Oench* doctrine was established by the United States Supreme Court in *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956; *reh'g denied*, 315 U.S. 830, 62 S.Ct. 910, 86 L.Ed. 1224 (1942). In that case, the Supreme Court refused to allow the defendant to defend against an FDIC demand for payment on a note on the basis of a secret agreement that the note would not be called. It established the following test:

> The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

*Id.* 315 U.S. at 460, 62 S.Ct. at 681.

Congress later codified the *D'Oench* doctrine as follows:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository insti-

tution, shall be valid against the Corporation unless such agreement—(1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e).

This statute and the common law rule allow FDIC examiners to rely solely on a failed bank's records to evaluate the worth of the bank's assets and to protect the bank from extraneous claims and defenses of which the FDIC could have no knowledge. *Langley v. FDIC*, 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). Both *D'Oench* and its statutory embodiment target primarily the evils of secret agreements between failed banks and borrowers. There is no requirement that there be an intent to defraud. *Timberland Design, Inc. v. First Service Bank for Savings*, 932 F.2d 46 (1st Cir.1991); *FDIC v. P.L.M. International, Inc.*, 834 F.2d 248, 252–53 (1st Cir.1987). Moreover, a significant body of case law has evolved defining the boundaries of the *D'Oench* doctrine. For example, in *Timberland, supra*, the Court of Appeals for the First Circuit noted that the *D'Oench* doctrine applies equally to the FDIC when it is acting in its corporate capacity or in its capacity as a receiver for failed banks; to defenses as well as affirmative claims of borrowers; and to claims sounding in tort, as well as in contract.

In *Timberland*, the court considered a claim by Timberland Design, Inc. that the First Service Bank for Savings orally agreed to lend it $3.9 million in addition to a $4 million loan to develop 750 acres of

---

**4.** In an opinion dated June 22, 1992, this Court recently determined that the FDIC holds a se-

cured claim in the amount of $2,746,675.

land in southern New Hampshire. The agreement was never reduced to a writing. Timberland filed a lender liability claim against First Service Bank, alleging deceit, negligent misrepresentation, breach of fiduciary duty, breach of contract, and violation of M.G.L. § 93A. Less than a week after Timberland filed the complaint, the FDIC was appointed receiver for the First Service Bank. The FDIC moved for summary judgment with respect to all five counts of Timberland's complaint. The district court granted the motion, and the court of appeals affirmed.

In addition to *Timberland,* the FDIC cites *Matter of CTS Truss, Inc.,* 868 F.2d 146, 150 (5th Cir.1989), in support of its position that Demakes' Complaint should be dismissed. In *CTS,* the debtor, and later the Chapter 7 trustee, argued that the FDIC's claim should be equitably subordinated pursuant to section 510(c) because of the wrongful conduct of the FDIC's predecessor in interest, the First National Bank of Midland. Although the debtor alleged that a bank officer had promised to make additional loans to fund the debtor's business expansion, the agreement was never reduced to writing, and the bank did not fund two promissory notes and did not extend additional financing. In reliance on the bank's misrepresentations, though, CTS purchased inventory and supplies and hired additional employees. According to the debtor, the expansion without the promised funds led to its bankruptcy.

The Court of Appeals for the Fifth Circuit rejected the debtor's claim for equitable subordination pursuant to section 510(c) of the Bankruptcy Code. It reviewed the paradigmatic cases for equitable subordination and found that the debtor's allegations that the bank failed to extend further financing as it had orally promised did not fall within the three general categories of cases which allowed equitable subordination:

> those in which a fiduciary of the debtor misuses his position to the disadvantage

of other creditors; those in which a third party, in effect, controls the debtor to the disadvantage of others; and those in which a third-party defrauds other creditors.

868 F.2d at 148–49 (footnotes omitted) (citation omitted). The court then held that the FDIC "shield" statute, *i.e.,* 12 U.S.C. § 1823(e), squarely covered the debtor's allegations against the FDIC, observing that the FDIC, in view of the statute's scope, should enjoy the rights of a holder in due course. The court also noted that "even if principles of equitable subordination otherwise permitted the imputation of wrongful conduct to a transferee such as the FDIC, [the court] would be constrained to hold that 12 U.S.C. § 1823(e) forbids that result." 868 F.2d at 150.

More recently, the Court of Appeals for the Fifth Circuit considered a counterclaim for setoff damages caused by a bank's breach of its obligations to advance funds pursuant to a line of credit. *Federal Deposit Insurance Corp. v. Hamilton,* 939 F.2d 1225 (5th Cir.1991). The court determined that the issue was whether the bank's obligation to the borrowers, as implied by prevailing banking customs, was an agreement which tended to mislead bank examiners. It concluded that "the long arm of *D'Oench, Duhme* reaches out to block [the borrowers'] claims." *Id.* 939 F.2d at 1229. The court added

> The rationale which bars claims based on oral agreements and collateral writings is equally applicable to claims based on unwritten, albeit widespread and prevailing, banking customs. Equity argues strongly that it should not be so, but the now broad redoubts of the *D'Oench, Duhme* fortress bind our analysis.

*Id.*[5]

■ In the present case, the Debtor claims that the Bank followed a course of conduct and dealing which was oppressive and unfair in derogation of the implied covenant of good faith and fair dealing. In

5. The *D'Oench* doctrine and its statutory counterpart have generated a number of metaphors. One court has spoken of the "dungeon of *Duhme." Bowen v. FDIC,* 915 F.2d 1013 (5th Cir.1990). Another has referred to the "Herculean power of 12 U.S.C. § 1283(e)." *McHose v. FDIC,* 882 F.2d 1311 (8th Cir.1989).

particular, the Complaint alleges that BNE 1) terminated the Debtor's financing, and 2) without legitimate business reason, obtained an *ex parte* order of trustee process, thereby freezing Demakes' funds and causing its checks to bounce.

In its memorandum in support of its opposition to the FDIC's Motion to Dismiss, Demakes tries to avoid the *D'Oench* bar by characterizing BNE's actions as arising out of the loan documents themselves so as to implicate a covenant of good faith and fair dealing that it argues is applicable to contracts of this nature.

Admittedly, there are limitations to the application of the *D'Oench* doctrine. The court in *In re Hunter*, 100 B.R. 321 (Bankr. S.D.Tex.1989), articulated the limitations as follows:

> Where a note imposes bilateral obligations on the parties in addition to the obligation on the maker to pay a sum certain, the borrower may assert such claims or defenses against the FDIC or FSLIC. Such claims or defenses arising out of the written agreement between the borrower and the failed bank will not be precluded under the *D'Oench Duhme* doctrine. Additionally, in a case where the borrower asserts a defense or counterclaim not grounded in a secret or side agreement precluded by *D'Oench Duhme*, and such borrower is innocent of wrongdoing or negligence in connection with the transaction, *D'Oench Duhme* will not apply and the FDIC or FSLIC will merely succeed to the rights which were possessed by the failed bank in connection with the transaction.

*Id.* 100 B.R. at 326. In attempting to circumvent the *D'Oench* doctrine, Demakes relies upon an unpublished memorandum opinion of the Massachusetts Superior Court, Suffolk County (King, J.), *New Bank of New England, N.A. v. James Berezny*, Sup.Ct. Civil Action No. 90–6062 (Aug. 16, 1991). In the *Berezny* case, the Superior Court held that neither the *D'Oench* doctrine nor section 1823(e) insulated the FDIC from counterclaims for breach of the covenant of good faith and fair dealing. In *Berezny*, the court found that allegations of the bank's "low-balling" valuations of the debtor's collateral, artificially creating defaults, forcing the debtor to work with "independent advisors," who owed their primary allegiance to the Bank, and consistently undermining work-out plans, if proved, would support a finding of breach of contract and the covenant of good faith and fair dealing. Apart from these actions, though, the state court agreed with the FDIC's position that "collateral agreements not reflected in the loan documentation" would not stand against the protection of the *D'Oench* doctrine. *Berezny* at 11. Significantly, the court dismissed the majority of the complaint, and allowed only the narrow, fact-specific claims noted here.

Demakes' Complaint evinces no such pattern of unfair dealing. The Complaint alleges no "low-balling" of the debtor's collateral, and there are no allegations, beyond the oral promise to extend the Credit Line, that BNE artificially drew Demakes into default on the Credit Line. Moreover, there are no allegations in the Complaint that fall within the categories of equitable subordination cases described by the Court of Appeals for the Fifth Circuit in *CTS, supra*.

Thus, it is unclear where the Debtor finds unfairness in the Bank's collection efforts, as the loan agreements and applicable law allow all the remedies taken by BNE with respect to a matured and unpaid note. The crucial fact here, which the Debtor avoids, is that the Credit Line, which is at the heart of this controversy, *matured* four months prior to BNE's steps to collect the outstanding debt. Despite its protestations to the contrary, the Debtor's entire argument rests on its unfortunate reliance on BNE's oral agreement that it would not enforce the maturity date of the Credit Line. The oral promise not to enforce the maturity date is exactly the type of "agreement" that cannot be asserted against the FDIC pursuant to section 1823(e) and the *D'Oench* doctrine. *Timberland, supra; CTS, supra*.

### V. Conclusion

In view of the foregoing, the memoranda and the arguments of counsel, whether or not specifically mentioned herein, the FDIC's Motion to Dismiss the Debtor's Complaint shall be and is hereby allowed.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. An appropriate order shall issue.