LAWLOR CORPORATION, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, as receiver for Bank of
New England, N.A., Donald Burnham
and Urban Development Action Group,
Inc., Defendants.

Civ. A. No. 91–10352–WGY.

United States District Court,
D. Massachusetts.

March 29, 1994.

Paul L. Kenny, Medford, MA, for Lawlor
Corp.

Philip Strome, Salem, MA, Christine P.
Deshler, Linda M. Grasso, Tedeschi, Grasso
& Mortensen, Paul E. Nemser, Goodwin,
Proctor & Hoar, Jennifer L. French, Rubin-
stein & Perry, Barbara Gruenthal, Cooke &
Associates, Boston, MA, for F.D.I.C., Donald
Burnham and Urban Development Action
Group, Inc.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

Lawlor Corporation ("Lawlor") is suing the Federal Deposit Insurance Corporation ("FDIC") in its capacity as receiver for the Bank of New England ("the Bank"), the Urban Development Action Group, Inc. ("Urban Development"), and Donald Burnham ("Burnham"), counsel to Urban Development, for damages arising out of an alleged breach of contract. Lawlor originally filed suit against the Bank in the Massachusetts Superior Court sitting in and for the County of Essex on September 7, 1989. On January 6, 1991, the Office of the Comptroller of the Currency declared the Bank insolvent and appointed the FDIC receiver. On or about February 2, 1991, the FDIC, pursuant to its authority under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") at 12 U.S.C. § 1819, removed the action to this Court.

The FDIC subsequently moved for summary judgment in this Court, asserting that the action was barred pursuant to the *D'Oench, Duhme* doctrine, codified at 12 U.S.C. § 1823(e). After oral argument, however, the Court and the parties agreed that the motion for summary judgment turns not on the *D'Oench, Duhme* doctrine but rather on the issue whether the Bank as holder of a first mortgage had priority over Lawlor's subsequent mechanic's lien, and if so, does this case warrant equitable subrogation.[1] The Court proceeds to analyze these contentions.

### "FACTS" IN THE SUMMARY JUDGMENT RECORD [2]

In 1988, Lawlor entered into a construction contract with Urban Development to convert a building in Salem, Massachusetts into condominium units. On August 4, 1988, in order to fund the acquisition, rehabilitation, and conversion of the property, Urban Development entered into a commitment letter for a $4,700,000 line of credit from the Bank. According to the commitment letter the construction contract for the project had to be approved by the Bank and its counsel and it was to be conditionally assigned by Urban Development to the Bank. (Commitment letter ¶ 11). In addition, the commitment letter stated that the general contractor for the project would be required to furnish payment and performance bonds, in the full contract amount, which named the Bank as dual obligee. (Commitment letter ¶ 13). Also according to the commitment letter, the Bank would retain a construction consultant to review the construction specifications, inspect the progress of the work, and make recommendations on the payment of requisitions. (Commitment letter ¶¶ 22, 23). On or about October 5, 1988, Urban Development entered into a written contract with Lawlor for performance of the rehabilitation and conversion work.

On October 26, 1988, Urban Development acquired the deed to the property at 100 Washington Street in Salem, Massachusetts. By a deed of the same date, Urban Development executed a $4,700,000 million dollar promissory note to the Bank, which granted the Bank a mortgage on the property. Urban Development also entered into a construction line of credit agreement with the Bank and executed a Collateral Assignment of Construction Contract to the Bank which Lawlor also signed. On October 31, 1988, Lawlor as principal, and the Traveler's Indemnity Company as surety, executed a labor and material payment bond and a performance bond in favor of Urban Development and the Bank as obligees.

Lawlor commenced work on the project in September 1988. After Urban Development's loan closed, all of Lawlor's requisitions for payment were reviewed by the Bank's construction consultant. In March, 1989, the Bank directed that a retainage assessment of five percent be applied to Lawlor's requisitions. As a result, the Bank began withholding five percent from the amounts its construction consultant certified were owed to Lawlor. The construction consultant reviewed Lawlor's requisitions for

---

1. The terms "equitable subrogation" and "equitable subordination" are used interchangeably in this Memorandum.

2. These "facts" are presented in the light most favorable to Lawlor, the non-moving party.

work performed through June 30, 1989, and the Bank retained $96,962.96. The Bank did not release any funds for payment of the work in June 1989. It later represented that these funds for payment of the work done in June would have exceeded the line of credit as set forth in the commitment letter. The Bank, however, never informed Lawlor of its position, and Lawlor continued work on the project.

On July 24, 1989, during a meeting between Lawlor's president, a Bank representative, and Burnham, the Bank's representative informed Lawlor's president that the Bank would make no further payments to Lawlor for work on the project. By letter dated July 25, 1989, Lawlor notified Burnham, Urban Development, and the Bank that, in accordance with the terms of the contract, Lawlor was discontinuing work on the project. Lawlor then submitted to the Bank a requisition for $271,864.00 for work done during the month of July. The Bank construction consultant approved a payment of $157,941.30. By letter dated August 18, 1989, Lawlor sent bills to Urban Development and the Bank for $167,594.00, the cost of storage of equipment related to the project.

On August 7, 1989, Lawlor recorded two notices of contract concerning the project in the Essex South County registry of deeds. One notice named Burnham and Urban Development as the owner; the other included the name of the Bank. On September 7, 1989, Lawlor brought this action in the Massachusetts Superior Court and filed motions for ex parte attachment of the real estate of Burnham and Urban Development and for lis pendens. The Superior Court ordered a hearing on Lawlor's motion for a preliminary injunction to enjoin Urban Development from alienating or encumbering the project real estate. After filing the complaint, Lawlor agreed to continue the hearing on its request for an injunction. This agreement was based on the Bank's assurances that the subject realty would not be alienated before the hearing. As of October 25, 1989, a hearing had not been set, and on that day the Bank's counsel notified Lawlor that the previous assurances were no longer operative but that the Bank would not alienate the property prior to the earlier of 3:00 p.m. on November 1, 1989, or the hearing. Unknown to Lawlor, however, one week earlier Urban Development had deeded the real estate to URDAC, Inc. ("URDAC"), a Massachusetts Corporation whose sole director was an attorney employed by the Bank and whose president was also president of the Bank.

On November 7, 1989, Urban Development's deed to URDAC was recorded. The deed stated that it was given in exchange for nominal non-monetary consideration. On April 3, 1990, an attested copy of Lawlor's complaint was recorded in the Essex South County Registry of deeds.

The Bank ultimately foreclosed on the mortgage held by URDAC and, some months later, auctioned off the property. At the auction, the Bank was the highest bidder at $1,212,000. The Bank then, for consideration of one dollar, assigned the deed to the property back to URDAC, the same party it had foreclosed on several months earlier. In October, 1991, URDAC sold the property for $350,000.00.

Lawlor contends here that even if the Bank's mortgage has first priority, the facts of this case warrant invocation of the doctrine of equitable subordination.

## DISCUSSION

 Summary judgment shall be granted only when the record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Cartrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). This Court must view the record in the light most favorable to the non-moving party. *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

In relevant part, Mass.Gen.L. ch. 254, § 13 states:

The rights of an attaching creditor shall not prevail as against a lien under section one, nor against the claim of a lienor where notice or notices of contract have been

filed or recorded in the registry of deeds ... prior to the recording of the attachment.

■ The FDIC contends that this Court must grant its motion for summary judgment since as matter of law its mortgage has priority over any subsequent mechanic's lien. True, the Bank would appear to have priority over Lawlor's claim since Lawlor filed the notice of contract on August 7, 1989, and the Bank had filed its mortgage in October, 1988. Moreover, at the time of filing Lawlor was aware of the Bank's rights in the property. Lawlor concedes these facts, yet contends that the doctrine of equitable subordination here prevents allowance of the FDIC's motion for summary judgment.

The Massachusetts Supreme Judicial Court has defined subrogation as "the substitution of one person in place of another, whether as a creditor, or the possessor of any other rightful claim, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies or securities." *Provident Co-op. Bank v. James Talcott, Inc.*, 358 Mass. 180, 188, 260 N.E.2d 903 (1970) (Quirico, J.) (quoting *Jackson Co. v. Boylston Mut. Ins. Co.*, 139 Mass. 508, 510, 2 N.E. 103 [1885] [Devens, J.] ).

For example, the Supreme Judicial Court has invoked the doctrine of equitable subrogation where a first mortgage has been discharged by mistake. *See Provident Co-op. Bank*, 358 Mass. at 180, 189–90, 260 N.E.2d 903; *Home Owners' Loan Corp. v. Baker*, 299 Mass. 158, 12 N.E.2d 199 (1937); *Worcester N. Sav. Inst. v. Farwell*, 292 Mass. 568, 198 N.E. 897 (1935). It has also been applied to situations involving a debtor inequitably attempting to defeat the rights of a creditor. *See Widett & Widett v. Snyder*, 392 Mass. 778, 467 N.E.2d 1312 (1984); *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332 (1st Cir.1992).

In *Widett*, the Supreme Judicial Court set aside on equitable principles a mortgage originally granted by a husband and wife to secure the indebtedness of a family-controlled corporation which by later assignments was acquired by the couple's son acting as nominee for the wife. The Supreme Judicial Court ruled that the mortgage was equitably extinguished, where to treat the mortgage as still in force would work an injustice upon a law firm whose claim for legal services was secured by a subordinate mortgage on the same property. *Id.* 392 Mass. at 783–85, 467 N.E.2d 1312. The controlling factor in determining whether or not to set aside a mortgage is "whether an injustice would be worked by not treating the mortgage as extinguished." *Widett*, 392 Mass. at 784, 467 N.E.2d 1312 (1984) (citing 3 R. Powell, Real Property ¶ 459, at 696.24–696.25 [P. Rohan ed., 1981] ).

Lawlor contends here that since URDAC was owned and directed by officers of the Bank, it was thereby either a subsidiary of the Bank or so closely related to the Bank that any transfer from Urban to URDAC was tantamount to a transfer to the Bank, which ought equitably extinguish the first mortgage since the failure to treat that mortgage as extinguished will work an injustice upon Lawlor. To support this contention, Lawlor offers evidence that the Bank and URDAC shared common officers, as well as the evidence which establishes that the Bank foreclosed upon URDAC only to turn around and deed the property back to URDAC for one dollar. This evidence effectively raises a genuine issue whether officers in the Bank were involved in a scheme to defeat Lawlor's lien and thereby maximize the Bank's return on its poor investment.

■ Losing this point, the FDIC retreats to the barrier of the *D'Oench Duhme* doctrine, arguing that it prevents this Court from invoking subrogation principles since their application necessarily implies an unwritten agreement between the Bank and Lawlor. This argument fails. Equitable subrogation is a well established doctrine in Massachusetts law. Its very purpose is to prevent unjust enrichment by equitably adjusting record title in the absence of any agreement between the parties. In contrast, *D'Oench* and its statutory counterpart are applicable to actions to enforce unrecorded

agreements against a failed bank.[3] The doctrine is not applicable to a claim seeking equitable subrogation based on the alleged bad acts or inequitable conduct of the bank officers. *See, e.g., FDIC v. Haddad,* 778 F.Supp. 1559, 1566 (S.D.Fla.1991) (common law claims of negligence and breach of fiduciary duty against a bank officer are not preempted by FIRREA). Indeed, in *In re 604 Columbus Avenue,* 968 F.2d 1332, 1362 (1st Cir.1992), the First Circuit declared that the FDIC is amenable to claims for equitable subordination which arise out of the alleged fraudulent acts of a bank by its officers or directors. While *In re Columbus Ave.* arose on appeal from the findings of a Bankruptcy Court, its legal analysis is no less applicable to the instant case. Accordingly, if the acts of the Bank were "illegal, egregious and severely unfair" to Lawlor, equitable subordination is appropriate.

■ The FDIC further argues that 12 U.S.C. § 1821(d)(13)(C) and § 1825(b)(2) prevent this Court from applying principles of equitable subordination to the present case since doing so would, in effect, place a lien or attachment on the assets of the Bank, and FIRREA specifically prohibits such action. This argument is likewise unavailing, however, since the sections just cited act only to prevent attachment of property that is rightfully an asset of a bank at the time the FDIC stepped in.[4] Any rights Lawlor may have in the property rightfully attached *prior* to the time that the FDIC took control of the Bank and arise out of a properly recorded mechanics lien. Accordingly, FIRREA affords the FDIC no protection against this claim for equitable subordination.

Summary judgment acts "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993).

Lawlor has set forth specific facts, in suitable evidentiary form, which establish the existence of a genuine issue for trial—specifically, did the officers of the Bank engage in inequitable conduct. Consequently, a trial is necessary to scrutinize fully the relationship of URDAC and the Bank and to determine if the transfer of the deed from Urban Development to URDAC equitably extinguished the Bank's first mortgage. "[A] court of equity will go behind the form [of a transfer] to reach the substantial merits of the case". *Ryer v. Gass,* 130 Mass. 227, 229 (1881). The crucible of a trial will determine whether the Bank and URDAC were involved in a scheme to prevent Lawlor from reaping the benefit of its contract with Urban Development.

## CONCLUSION

Since Lawlor has produced evidence which, if credited, warrants this Court invoking the common law doctrine of equitable subordination, the motion of the FDIC for summary judgment must be, and hereby is, DENIED.

SO ORDERED.

---

**3.** Cases which hold that equitable subordination claims against the FDIC are barred under *D'Oench* involve allegations of fraud or bad faith in the inducement of the unrecorded contract sought to be enforced against the failed bank. *See In re 604 Columbus Ave.,* 968 F.2d 1332 (1st Cir.1992); *Matter of CTS Truss, Inc.,* 868 F.2d 146 (5th Cir.1989); *In re Demakes Enter., Inc.,* 143 B.R. 304 (Bankr.D.Mass.1992).

**4.** Section 1825(b)(2) is expressly intended to exempt the FDIC from liability on state tax liens asserted during foreclosure proceedings.