Garsh, J.
This business dispute arises out of the purchase and assignment of a first mortgage from the plaintiff, The Balcor Company (“Balcor") to the third-party defendant NPH Realty Ltd. (“NPH”). The defendants-cross claimants and third-party plaintiffs Kenneth Michel and Lawrence Litwak, as trustees of the Larken Realty Trust (“Larken”), allege that defendant-cross claim defendant Daejen (Massachusetts) Inc. (“Daejen”) and NPH orchestrated the assignment of Balcor’s mortgage to NPH specifically to defeat Larken’s second mortgage. Daejen now moves for summary judgment on Counts I (chapter 93A), IV (specific performance) and V (declaratory judgment) of Larken’s cross-claims and NPH moves for summary judgment on all counts of Larken’s third-party complaint. For the reasons stated below, the motions for summary judgment are allowed.
BACKGROUND
The following facts are not in dispute. In 1984, Larken purchased an office building (the “Property”) located at 77 North Washington Street, in Boston, for approximately $3.2 million. In 1986, Larken refinanced the Property through Balcor. In connection with the refinancing, Larken executed a note and conveyed a mortgage to Balcor in the amount of $6.1 million dollars. In May 1988, Larken sold the Property to Daejen for $ 11.2 million. In this transaction, Daejen assumed Larken’s obligations on the Balcor mortgage in the same amount. Both the Balcor note and the Larken note were due and payable on August 19, 1991. Larken was aware that the Property was the sole asset of Daejen, and that Daejen was the sole obligor on the second Larken mortgage.
Unfortunately, property values in the Boston area declined dramatically. When both the Balcor and Larken notes became due, Daejen was unable to make either payment and defaulted. Consequently, on August 30, 1991, Balcor obtained a preliminary injunction allowing it to take possession of the Property as mortgagee-in-possession. In addition, Balcor scheduled a foreclosure sale for November 13, 1991. Between August and November 1991, Daejen attempted to negotiate a workout agreement with both Balcor and Larken. These attempts were not successful.
As the foreclosure date approached, Daejen continued to negotiate with Balcor. Also during this time, Daejen Holdings PLC (“Holdings”), a publicly traded *31 British company that was Daejen’s corporate grandparent, actively sought a friendly third-party investor who could buy Balcor’s note and receive an assignment of Balcor’s first mortgage. The first person Holdings contacted was Michael Barnett (“Barnett”) of London, England. Barnett declined to participate in any transaction regarding the Balcor mortgage because he was a principal in Holdings’ independent accounting firm and considered such a transaction to be a conflict of interest. Barnett suggested to Holdings that Isaac Babad (“Babad”), also of London, England, might be interested in purchasing the Balcor mortgage at a discount (“the Transaction”). Prior to this Transaction, Babad had purchased various properties from Holdings, and he was a personal acquaintance of Solomon Freshwater (“Freshwater”), a director of Holdings.[3] Freshwater and Babad met to discuss the Property and Babad reviewed certain documents, including rent rolls and revenues therefrom. Foreclosure by Balcor was imminent. Babad requested that Holdings finance the purchase of the Balcor first mortgage. One factor that Freshwater considered in Holdings’ making such a loan was Babad’s willingness to be flexible in forbearing from immediately foreclosing on the Property. Eventually, Babad and Holdings came to a financial arrangement whereby Holdings loaned NAH Properties, Ltd. (“NAH”), a British Limited Company controlled by Babad, a total of $5.2 million to purchase Balcor’s first mortgage. As part of the agreement, Babad and his wife executed personal guarantees on the performance of this loan. Babad and his wife had substantial assets and would have been able to honor their personal guaranty in an amount reasonably anticipated to be the shortfall over the value of the Property. Holdings also obtained a lien on the Property to secure the loan.
Babad’s stated desire to purchase the Balcor mortgage was based in part on the following: a) the immediate gain of $400,000, which was the difference between the purchase price of $5.2 million and the principal due under the Balcor first mortgage of $5.6 million: and b) the Property’s positive cash flow, which would immediately become available to the purchaser of the mortgage. Even during a difficult real estate market, the Property generated positive cash income. Babad further states that all dealings between himself and his controlled companies and Holdings and-Balcor were completely at arms-length and motivated only by the prospect of profit and income.
On November 27, 1991, Holdings advanced to NAH $4.2 million of the $5.2 million loan. The remainder of the money had previously been wired to attorneys for the entity managing the Property for Daejen to be used as a deposit should a deal with Balcor be consummated. These funds were sent to Balcor. There is no evidence of any agreement with Babad before the “deposit” funds were wired.
On December 4, 1991, a company called NPH Really, Ltd. (“NPH”) was incorporated in New York. All of NPH’s stock is owned by NAH. Then, on December 10, 1991, NPH executed an “Assignment of Loan Documents” with Balcor that reflected the acquisition of Balcor’s first mortgage in exchange for $5.2 million. Consequently, on December 12, 1991, Balcor received a wire transfer of $4.72 million from NPH. Daejen advanced no funds to NAH or NPH. As a result of the purchase and assignment, NPH stepped into the position of first mortgagee, while Larken remained in second position.
On March 12, 1993, a foreclosure sale of the Properly was conducted and NPH was the high bidder for the Property with a $5.2 million bid. Larken’s interest in the Property was extinguished. Currently, NPH is the record owner of the Property. The present controversy before the court concerns the validity of the first mortgage.
DISCUSSION
Larken argues that a trial is necessary to unravel an alleged agency relationship between Holdings, NPH, and Daejen. Larken contends that Holdings and NPH “fronted” for Daejen. Alternatively, Larken argues that a trial is necessary to determine how much control Holdings exercised over Daejen and NPH in order to “pierce the corporate veil.” Larken also claims that summary judgment is inappropriate because a trial is necessary to go behind the form of Balcor’s assignment to NPH in order to determine the true intent of the parties.
Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976): Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time Inc., 404 Mass. 14, 16-17 (1989). With respect to any claim on which the party moving for summary judgment does not have the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp. 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Pederson v. Time, Inc., 404 Mass. at 17. The opposing party cannot rest the pleadings and mere assertions of disputed facts to *32 defeat a motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
Agency Relationship Between Holdings and Daejen
In order for an agency relationship to exist, there must be a “manifestation of consent by one person to another that the other shall act on his behalf and subject to his control.” Kirkpatrick v. Boston Mutual Life Insurance Co., 393 Mass. 640, 645 (1985), quoting Restatement (Second) of Agency §1(1) (1958).
Larken alleges that Holdings acted as agent for Daejen, the principal. Usually, a party attempts to hold a parent corporation liable as principal for the acts of its subsidiary as agent. Although Larken argues the reverse, the agency analysis is nonetheless the same.
To support its agency theory, Larken points to the fact that Freshwater controls, either directly or indirectly, a majority of the stock in Holdings, and that at one time he was a director of Daejen and its president, and currently he is its vice-president. In addition, Larken claims that Holdings is nothing more than a holding company, whose principal activities are carried on by its subsidiaries. Larken also references the fact that Holdings forwarded all the offers to Balcor, drafted the assignment documents and provided the money to NAH.
To infer, as Larken does, that the above facts may demonstrate that Holdings was acting at the behest and control of Daejen, whose only asset was the Property, goes beyond the undisputed evidence and is unsupported by the case law. An agency relationship is characterized by two essential elements: control and consent. Kirkpatrick, 393 Mass. at 645. Larken has not developed any evidence which would support an inference based on probability, and not mere possibility, that Holdings, a separate and distinct corporate entity, consented to act on behalf of Daejen, another separate corporation. Nor is there evidence which would support a finding that Daejen exercised control over Holdings’ actions and affairs. Instead, the undisputed evidence demonstrates that NAH borrowed $5.2 million from Holdings, and subsequently transferred that money to NPH so it could purchase the Balcor note. Babad stated in his affidavit that the transaction between Holdings and NAH, as well as the transaction between NPH and Balcor, were completely at arms-length. Larken has failed to develop evidence to indicate otherwise. It “is not entitled to build a case on the gossamer threads of whimsy, speculation, and conjecture." Manganaro v. Delaval Separator Co., 309 F.2d 389, 393 (1st Cir. 1962).
The uncontroverted evidence is that Holdings’ decision to loan $5.2 million to NAH was nothing more than a business decision entered into by two separate and distinct corporations. The court will not treat a separate and legal corporation as the “alter ego” or agent of another corporation simply because there is some evidence that one person is a majority stockholder in the two corporations. Marsch v. Southern New England Railroad Corp., 230 Mass. 483, 497 (1918). Corporations are individual entities, and the court applies the same standard as if the alleged principal were two wholly unrelated corporations. Westcott Construction Corp. v. Cumberland Construction Co, Inc., 3 Mass.App.Ct. 294, 297 (1975). While the fact that Freshwater is a director of Holdings and a vice president of Daejen is entitled to some weight, that alone is far from conclusive that an agency relationship exists. Id. (“common ownership and control of the two corporations, standing alone, is insufficient to merge them into one or make either the agent of the other”). For agency purposes, stock control is not synonymous with ownership. Restatement (Second) of Agency §14M. Larken, the party alleging an agency relationship, has failed to provide facts to justify a finding of the requisite control and consent.
Larken fares no better on its argument that Daejen was an agent of Holdings. A corporation does not become the agent of another corporation merely because the other has stock control. Freshwater testified at his deposition that the day-to-day operations of Daejen were under the control of Labe Twerski (‘Twerski”), a director of Daejen U.S., Inc. (“US”), a separate, but affiliated, corporation to both Holdings and Daejen. Freshwater further testified that any decision regarding Daejen was based upon the recommendation of Twerski. Indeed, throughout the course of their business relationship, Daejen never represented to Larken that it was acting on behalf of Holdings. In fact, the unrefuted evidence establishes that Larken was fully aware of Holdings’ separate legal existence. Freshwater’s involvement with both Holdings and Daejen does not, by itself, make one corporation the agent of the other. Westcott Construction Corp., 3 Mass.App.Ct. at 297. In order for Larken to establish an agency relationship, Larken is required to provide specific facts which support an inference of both pervasive control and consent by Holdings, as principal, over Daejen, its alleged agent. Absent such a showing, Larken’s agency theory must necessarily fail.
Larken has failed to meet its burden that Holdings either exercised “pervasive control” over Daejen or that Daejen consented to act on Holdings’ behalf. Larken provides insufficient evidence to suggest that Daejen and Holdings are anything but separate corporations involved in separate enterprises. Simply because Holdings considered it “good business” to assist Daejen, Larken concludes, without support, that Daejen was acting as Holdings’ agent. There is no basis in either the record or the case law to support Larken’s bold claim. In the end, Larken has failed to establish either element of agency with specific facts. See Lalonde, 405 Mass. 207; Pederson, 404 Mass. at 17. The purpose of summary judgment is “to make possible the prompt disposition of controversies on their *33 merits without trial, if in essence there.is no real dispute as to the salient facts or if only a question of law is involved.” Cassesso, 390 Mass. at 422. As the moving parties, Daejen and NPH bear the burden of affirmatively demonstrating that absence of a triable issue, and “[further] that [it] is entitled to judgment as a matter of law.” Pederson, 404 Mass. at 17. Daejen and NPH have sustained their burden.
Piercing the Corporate Veil Between Holdings and Daejen
A cause of action based on piercing the corporate veil is fundamentally distinct from an action based on agency. Piercing the corporate veil is used to “demonstrate that two purportedly separate entities are, under certain circumstances, in reality the same actor.” Comind, Coimpanhia De Seguros v. Sikorsky Aircraft, 116 F.R.D. 397, 405 (D.Conn. 1987). Agency, on the other hand, “respects the legal and physical separateness of the alleged principal and agent, finding liability on the part of the agent or principal only as an outgrowth of their contractual interrelationship as defined by contractual consent.” Id. The scope of the agency and the liability of the principal is defined by “the principal’s contractual consent that empowers the agent to act on the principal’s behalf.” Id.
In order for Larken to pierce the corporate veil, it must meet a very high standard. Disregard of separate corporate entities arises in “rare particular situations to prevent gross inequity” and is the exception, not the rule. My Bread Baking Co. v. Cumberland Farms, 353 Mass. 614, 620 (1968). There are two ways to disregard separate corporate entities under the My Bread Baking Co. standard:
(1) there is active and pervasive control of related business entities by the same controlling persons and there is a fraudulent or injurious consequences by reason of the relationship among those business entities (emphasis added); or (2) there is a “confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which various corporations and their representatives are acting.
My Bread Baking Co., 353 Mass. at 619.
Those generalized factors are further broken down into twelve specific categories which should be considered in deciding whether to cut through the corporate shield. The twelve factors are as follows:
(1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; (12) use of the corporation for promoting fraud.
Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985).
In support of its piercing the corporate veil theory, Larken relies upon the same set of facts it used to argue its agency theory. Those facts, when matched up against the twelve factors listed above, are wholly inadequate to penetrate the companies’ corporate shields. Moreover, at the time Daejen executed the second Larken mortgage, Larken was aware of the separate legal existence of Holdings, US and Daejen. Larken never requested that Holdings or US be a maker on or guarantor of the first mortgage. Indeed, even now, Larken does not claim that Holdings is liable on the note from Daejen to Larken, which it presumably would be if the corporate veil properly could be pierced.
Although the court’s task is not an exercise in counting the number of factors in the record, Larken proffers insufficient facts which would indicate that the “the overall structure and operation misleads” and that there has been “dubious manipulation and contrivance, finagling, such that corporate identities are confused.” Evans v. Multicon Construction Corp., 30 Mass.App.Ct. 728, 736 (1991). See also Berger v. H.P. Hood, Inc., 416 Mass. 652, 657 (1993). Nor is there any inequity. Larken remains in the very same position that it was in when Balcor was about to foreclose. Only the name of the first mortgagor has been changed. Larken did not seek a guarantee from Holdings when it sold the Property to Daejen. No fraud or misrepresentation is alleged. The court is not persuaded that, on these facts, it would be justified in looking beyond any of the individual corporate identities.
Other Agency Relationships
Larken also asserts that NPH is an agent of both Daejen and Holdings. Larken alleges, in support, that NPH failed to conduct an independent investigation of the Property, relying instead on Freshwater and upon Daejen’s lawyers. In addition, Larken asserts that neither NPH, its parent NAH, or Babad committed any of their own money to the transaction. Rather, NPH borrowed the money from Holdings, a company controlled by Babad’s friend Freshwater. It is from these facts, and all of the inferences drawn from them, that Larken argues that NPH was acting as Holdings’ and Daejen’s agent.
Once again, there are two essential elements required to transform an ordinary business relationship into an agency relationship: control and consent. Larken’s claim that NPH acted subject to the pervasive control of both Daejen and Holdings is not supported by the evidence. On the contrary, the undisputed evidence indicates that neither Holdings nor Daejen forced Babad to purchase Balcor’s first *34 mortgage. Babad reviewed certain financial documents about the Property and decided, independent of Holdings and Daejen, that the purchase of Balcor’s note at a discount was a good business investment. Similarly, there is no evidence that NPH consented to act as either Daejen’s or Holdings' agent. The fact that Daejen’s and Holdings’ attorney drafted the assignment documents does not support an inference that NPH or NAH consented to act as an instrument of Daejen and Holdings. Further, with respect to Daejen, it had no funds to loan to NPH as the Property was its sole asset and NPH had the right which it exercised, to terminate Daejen’s interest through foreclosure.
Merger and Extinguishment of Balcor’s Mortgage
Even assuming that Larken could establish that NAH and NPH were agents of Holdings and that Holdings, therefore, purchased Balcor’s first mortgage, there would be no merger or extinguishment on the facts of this case. Generally speaking, if the money has been paid by one who is obligated, by contract or otherwise, to pay the mortgage, the assignment will be disregarded and it is a release. Heller Financial v. Insurance Co. of North America, 410 Mass. 400, 403 (1991). Holdings was neither an obligor nor a guarantor of Balcor’s first mortgage or Larken’s second mortgage. Thus, Larken heeds another way to prove that the mortgage was extinguished.
Where, as here, the party who pays the mortgagee has no legal obligation to pay, the intent of the parties is scrutinized to determine whether the mortgage was extinguished or assigned. Id. In determining the intent of the parties, the court ”look[s] at the substance of the transaction, including the relationship between the parties, and not at the form.” Id. at 404.
Larken maintains that the question of intent is a factuál issue that may not be decided on a motion for summary judgment. But even when state of mind is at issue, to avoid summary judgment, “the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257-56 (1986); see also National Association of Government Employees, Inc. v. Central Broadcasting Co., 379 Mass. 220, 231 (1979) (quoting Hahn v. Sargent, 523 F.2d 461, 469 (1st Cir. 1975), cert. den., 425 U.S. 904 (1976) (“There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim”)).
There is no evidence from which a fact finder could determine that Holdings intended a merger to take place. Apart from the fact that the documents executed by NPH and Balcor reflect an assignment of the mortgage and not a purchase by Daejen, Freshwater specifically states in his affidavit that neither Holdings nor Daejen intended NPH’s purchase of Balcor’s first mortgage note to merge and extinguish the mortgage. Commonwealth Bank & Trust Co. v. Plotkin, 371 Mass. 218, 221 (1976) (affiant competent to testify as to his own intent). Freshwater’s stated reasons are buttressed by the fact that NPH purchased the Balcor note at a discount and the Holdings’ loan was made in return for a security interest in the assets of NAH, along with the personal guarantees of Isaac Babad and his wife. It would have been irrational for the parties to have intended a merger. Savage v. Hall, 12 Gray 363, 365 (Mass. 1859) (“merger is held not take effect where the manifest interest of the party taking such conveyance is to acquire the mortgage interest. Especially such merger does not take effect where the interest of the party requires that he should continue to hold his two different titles distinct to protect him against some other interest which would intervene between the two estates in case they were held to be merged”).
Alternatively, Larken argues that, irrespective of the intent of the parties, equity mandates that the mortgage be extinguished. Widett & Widett v. Snyder, 392 Mass. 778, 784 (1984). Indeed, “the intent of the parties will not be allowed to control if to do so will be unfair to third parties.” Heller Financial, 410 Mass. at 404. Larken maintains that its inability to recover on its second mortgage upon foreclosure by NPH is unfair and inequitable because Holdings possibly could end up owning the Property free from Larken’s second mortgage.
Larken’s reliance on Widett & Widett is misplaced. The facts in the present case stand in significant contrast to the facts in Widett & Widett.[4] For example, in Widett & Widett, the defendant was a guarantor on the mortgage prior to foreclosure, and when the defendant assigned the mortgage, it did so for only nominal consideration ($1.00). Under the facts in the present case, neither Holdings nor NPH was obligated to pay the Balcor note, and when NPH purchased Balcor’s note, it did so for a substantial amount of money. Holdings was not obligated to put $5.2 million at risk; it made a valid business decision to secure its loan with an interest in the assets of NPH and NAH (i.e. the Property). See Heller Financial, 410 Mass. at 405-06 (“Since NERCO was nearly bankrupt, INA took financial risk in guaranteeing the CSB loan... The fact that INA was looking out for its own interest. . . does not lead us to conclude that equity mandates that INA’s mortgage be subordinated”). Unlike the situation in Widett & Widett, where the Court noted that ”[t]he only apparent purpose [of the assignment] was to maintain the mortgage ... in a position subordinate to the third mortgage,” Widett & Widett, 392 Mass. at 785, NAH’s agreement with Holdings was motivated by the prospect of profit and income. Larken’s experiencing the risk inherent in a second mortgage does not render the transaction unfair and inequitable.
*35 Larken’s contention that Holdings may someday own the Properly if it forecloses on NAH’s note is purely speculative. That has not occurred; there is no evidence from which it could be determined that it probably will occur; the note is guaranteed by Babad and his wife. Moreover, Holdings, a separate corporation from Daejen with no obligations on the Balcor first mortgage, would have been free to purchase it on its own, although it did not, without merging or extinguishing the first mortgage. Larken was also free to acquire the first mortgage. The equity principals articulated in Widett & Widett are inapplicable to the facts of this case.
ORDER
For the foregoing reasons, it is hereby ORDERED that Defendant-Cross Claim Defendant, Daejen (Massachusetts) Inc.’s Motion for Summary Judgment on Counts I, IV, and V of Larken Realty Trust’s cross claim be ALLOWED.
It is further ORDERED that the third-party defen-dantNPH Realty Ltd.’s Motion for Summary Judgment on all counts of Larken Realty Trust’s third-party complaint be ALLOWED.

 At one time, Freshwater was Daejen’s president. He is currently its vice president.

 In Widett & Widett, the defendants, a husband and wife, granted a third mortgage on their property to secure the indebtedness of a corporation, privately held and controlled by members of the defendants’ family. A few days later, the defendants granted a fourth mortgage to the plaintiff, a law firm. After a foreclosure sale ordered by the bankruptcy court, the third mortgage was assigned to the defendants’ son for the nominal sum of one dollar. In addition, all of the other secured debts held by the mortgagee were discharged. The court held that the only purpose for the assignment was to maintain the fourth mortgage subordinated to the third mortgage.