MacDonald, D. Lloyd, J.
PROCEDURAL BACKGROUND
The present case is a legal malpractice action arising out of the representation of the Plaintiff Mary Lingis (the “Plaintiff’ or “Lingis”) in her capacity as executrix of her brother, Edward’s, estate by the Defendant Burton Waisbren, Jr. (the “Defendant” or “Waisbren”). Edward Lingis will hereafter be referred to as “Edward.”
Edward died on April 23rd 4997 at the UMass Medical Center (“UMass Medical”) in Worcester. He was 68 at the time. The cause o"f death was a rampant infection (“empyema” or “sepsis”). He had been hospitalized at UMass Medical sincé the latter part of February, with an initial diagnosis of depression and anorexia. The delay in the medical personnel’s discovery of the infection and Lingis’s owñ sense that it should have been discovered earlier led Lingis as her brother’s executrix to seek legal advice as to whether malpractice had been committed by Edward’s physicians. In a series of events detailed more fully below in the Court’s findings of fact, Lingis in February 1998 was introduced to Waisbren. Before Waisbren became a lawyer, he had been a practicing physician. After reviewing Edward’s medical records, Waisbren advised Ms. Lingis that he believed that Edward had died because of negligent medical treatment. Pursuant to a written contingency fee agreement, Lingis then retained Waisbren to pursue her claim as Edward’s executor.
Waisbren filed a complaint on March 23, 1998 in the Worcester Superior Court against two physicians who participated in Edward’s care, Worcester Superior Court Civil Action No. 98-0662B (the “Original Action”). After Waisbren hired an expert, the complaint was amended, dropping the original two physician defendants and adding five other UMass Medical physicians.
In May 2000 a Medical Malpractice Tribunal rejected Lingis’s case. However, at the urging of Waisbren, Lingis advanced $6,000 into court as a bond pursuant to the provisions of G.L.c. 231, §60B in order to permit the case to continue to proceed.
In January 2001 a summary judgment motion was initiated through the 9A process on behalf of the five defendants premised on their alleged immunity as “public employees” at UMass Medical under the Massachusetts Torts Claims Act, G.L.c. 258, §2. Without Lingis’s approval, Waisbren executed a stipulation of dismissal of all claims against the physicians on February 7, 2001. Upon becoming aware of the dismissal a week later, Lingis objected to the dismissal, retained new counsel and in due course brought the present action sounding in legal malpractice and c. 93A, §9 against Waisbren.
A jury was empanelled on April 4, 2005 to try the common-law claims, but the Court reserved the c. 93A count. See Nei v. Burley, 388 Mass. 307, 311-15 (1983).
With its being a legal malpractice case, a “trial within a trial” was required. See Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C., 25 Mass.App.Ct. 107, 113 (1987). Thus, at the close of the evidence, the jury was instructed, inter alia, that in order to find the Defendant negligent, the Plaintiff first needed to prove by a preponderance of the evidence that had the Original Action gone forward, it was more likely than not that the Plaintiff would have prevailed against the five UMass Medical doctors. In the verdict form provided to the jurors, the first question was, “Were the defendant doctors at the UMass Medical Center negligent in the medical care provided to Edward Lingis?” The jury answered that question, “No,” and thus a verdict was necessarily returned in favor of the Defendant.
*440 The Court thereafter took the matter under advisement for purposes of the 93A claim and herein renders its findings and rulings in that regard.
FINDINGS OF FACT
On the basis of the testimony, exhibits and reasonable inferences drawn therefrom I find the following facts.
From the time of Edward’s death the Plaintiff suspected that medical malpractice had caused it. Accordingly, soon thereafter she sought his records from UMass Medical. After a period of six to seven months, which she characterized as having been caused by the hospital “stalling,” she obtained the records. The Plaintiff then sought to find a lawyer to review the records and advise her as to whether malpractice had occurred. In the course of doing so, she went on the internet to the website, “Law Docs,” where she found information that led her to the Defendant. In on or about Februaiy 1998 Lingis interviewed Waisbren at his office and left the medical records with him to review.
The Defendant had graduated from Tufts Medical School in 1973 and did his internship and residency at Boston City Hospital. He thereafter did a fellowship in cardiology at Cornell. From 1977-1989 he practiced internal medicine and cardiology in Wisconsin before relocating to Massachusetts, where he practiced general medicine but continuing with the same specialties, as well.
In 1994 or 1995 (the testimony at trial was unclear), Waisbren graduated from the Massachusetts School of Law. He became a member of the bar in 1995. He began practicing law in partnership with another attorney. And from the outset of his law practice, the Defendant held himself out as a specialist in medical malpractice. At trial Waisbren testified to having been involved in between 100-200 medical malpractice cases, to one extent or another, before being retained by Lingis. However, he had not tried any such cases to verdict before.
After Waisbren’s initial meeting with the Plaintiff and his review of Edward’s records, he wrote to her on Februaiy 27, 1998, “I feel that your case is meritorious and that you would make a sympathetic and credible witness. For these reasons I am willing to accept your case if you would like to go forward.” Lingis did in fact want to go forward, and she executed a contingency fee agreement with the Defendant pursuant to which she was obligated to pay a non-refundable “Pre-Filing Fee” of $3,500 and to pay future expert witness fees and other litigation expenses and disbursements.
On March 23, 1998 the Defendant filed the Original Action against two doctors affiliated with the UMass Medical. (The complaint was misdated as March 23, 1997.) After retaining an expert to evaluate the case and to testify for Lingis (see further findings below), Waisbren filed an amended complaint on February 2, 1999, dropping the two defendant physicians he had originally named and adding five new doctors, also affiliated with the UMass Medical Center.
The expert hired by the Defendant (and paid for by the Plaintiff), David Fried, M.D., prepared a report which concluded that the five defendant physicians had breached the standard of care by incorrectly diagnosing the source ofEdward’s infection and failing timely to treat it, which, in turn, caused his death. Dr. Fried’s conclusions closely paralleled the Defendant’s own theories as to liability that were communicated to Dr. Fried in his April 14, 1998 transmittal letter accompanying the medical records. Waisbren wrote at that time to Dr. Fried, “My opinion with which I hope you agree” was that there had been a negligent failure to diagnose the “right sided empyema in a timely fashion” and the doctors “negligently and incorrectly attributed to depression Plaintiffs anorexia and other constitutional symptoms which were, in fact, due to Plaintiffs undiagnosed empyema and sepsis.”
In May 2000 (over two years after the original complaint was filed) a Medical Malpractice Tribunal was convened pursuant to G.L.c. 231, §60B. The statutory issue before the Tribunal was whether “if the evidence presented if properly substantiated is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiffs case is merely an unfortunate medical result.” Id.
The Defendant chose not to attend the Tribunal. Instead, he sent an associate to make the presentation on behalf of the Plaintiff. As his reason for not attending, the Defendant testified at trial that it was because he was hard of hearing (sic). The Plaintiff attended the Tribunal and described Waisbren’s associate as unfamiliar with the facts of the case and unable knowledgeably to respond to the questions of the Tribunal members. The Tribunal found for the defendant doctors.
On May 20, 2000 the Defendant wrote to the Plaintiff informing her of the outcome: “Although we are disappointed!,] this is assuredly not the end of the line — you continue to have a legal right to a jury trial in this matter if you care to post a bond [of $6,000].” Waisbren concluded, “We believe in your case and hope you will not give up.”
The Plaintiff did not give up and in short order advanced $6,000 for the bond.
Neither before nor after the Tribunal hearing did Waisbren file any discovery requests, whether for documents, interrogatories or for deposition testimony. At trial, the Defendant acknowledged that there were no limitations on discovery that prevented him from obtaining it.
In January 2001 the Defendant was served through the Rule 9A process with motions for summary judgment on behalf of the five physician defendants. The motions were all predicated on the proposition that *441 each of the doctors were employees of the UMass Medical Center and as such were “public employees” under the Massachusetts Tort Claims Act, G.L.c. 258, §1. They were, therefore, allegedly immune from tort liability pursuant to c. 258, §2. Further, because no presentment letter had been filed within the two-year period following the accrual of Edward’s claim as required by G.L.c. 258, §4, such a claim against the Commonwealth was barred.
The Defendant informed the Plaintiff of the summary judgment motion and memorialized his conversation with her in a letter on January 26th 2001 in which he wrote:
(T)hrough discovery and communications with the defendants’ attorney, we have learned that the defendants’ position is that pursuant to G.L.c. 258 at the time of the cause of action 'they were solely public employees. If that defense is valid, they shall be immune from personal liability. Also, their employer at the time of the cause of- action has, at maximum, limited liability for the reasons we discussed.
If we lose an anticipated motion for summary judgment as to this argument, we may be subject to substantial costs and penalties and we plan to avoid such exposure as I indicated to you. If we deem it necessary to dismiss.your case, it would be contingent on the return to you of your tribunal bond with interest.
I will keep you posted as to our research and progress in this regard.
In the conversation with the Defendant that preceded her receipt of the letter, Lingis expressed doubt at to the substance of the defendant doctors’ position. She also expressed surprise that Waisbren brought the issue to her attention so late. She asked Waisbren about the alternative of suing the doctors’ alleged employer, UMass Medical. The Defendant responded that it would not be profitable because a recovery would be capped at between'$10,000 to $20,000.
Without further communicating with Lingis, on February 6, 2001 the Defendant chosé to execute a stipulation of dismissal with prejudice of the amended complaint as to the five physician defendants.
On February 13, 2001, the Defendant wrote to the Plaintiff: ->
Following up with you on my letter of January 26, 2001, after reviewing your case with my associates and considering both your prospects for a successful jury verdict vis a vis the risk of losing a motion for summary judgment, we have come to the conclusion that it would be best to secure, for you, the return of your $6,000 tribunal bond in return for the dismissal of your case.. The defendants have agreed to this.
Under separate cover we will be returning your records. It will probably take a month or two to secure the bond, with interest, back from the Court. In this regard, please provide me with your social security number.
The Plaintiff was “shocked” by the letter and considered it a “bombshell” because she had not been consulted further after the conversation she had with Waisbren in which he described the prospect of the summary judgment motion. As noted above, in that conversation, Lingis expressed doubt that there was any merit to the doctor defendants’ position. Neither in that conversation or in any other communication did Lingis authorize Waisbren to dismiss the case.
When Lingis called Waisbren to protest his dismissal of her claim, he stated, “It’s finished,” and hung up on Lingis. He thereafter refused to take her calls.
Lingis was so angry that she refused to provide the Defendant with her Social Security number and, instead, obtained the return of the bond by herself. More pointedly, within weeks she hired new counsel (counsel who appeared for her at trial) to bring a legal malpractice action against the Defendant because of his unauthorized dismissal of what she believed was her meritorious case. New counsel’s motion to vacate the dismissal was denied.
In his trial testimony Waisbren acknowledged that under the Rules of Professional Responsibility it is for the client to make the decision whether to dismiss a case. However, the Defendant repeatedly asserted that he had — in fact — discussed in detail with the Plaintiff the pluses and minuses of going forward with the case to oppose summary judgment and that she approved the decision not to do so.
As to his reasons for recommending the dismissal, the Defendant testified that it was because — after the adverse result at the Tribunal — he concluded that there was “virtually no chance” of success and that it was “100%” likely that they would lose before a jury. Curiously, in his trial testimony Waisbren, nevertheless, expressed confidence that he could have prevailed at the summary judgment stage. However, he said that he believed that to proceed further with the case beyond summary judgment would only generate more expenses for both sides. Because he said that he was certain that the Plaintiff would ultimately lose and because, further, he perceived the defendants’ counsel was pursuing a “scorched earth policy,” Waisbren claimed that he was convinced that, in the end, Lingis would be ordered by the trial court to pay the defendants’ legal fees and expenses as “penalties” for having pursued a claim without merit.[1]
In sum, the Defendant asserted at trial that he recommended settlement by dismissal of the claim and the recapture of the $6,000 cash bond in order to protect the Plaintiff from further financial exposure. After he explained his thinking to the Plaintiff, Waisbren testified that Lingis “fully and knowingly” approved his course of action.
*442 Having heard the Defendant’s testimony and observed his demeanor at the time, I do not credit it. To the contrary, I find as a fact that he did not obtain the Plaintiffs consent. Further, I find as a fact that the reason he did not seek it was that he knew that the Plaintiff would not agree to her case being dismissed.
In addition, I find as a fact that at the point that he dismissed the case Waisbren had not competently thought through the Plaintiffs options at the summary judgment stage, for example, to seek discoveiy on the defendant physicians’ independent contractor vs. employee status at UMass Medical. He prematurely concluded that he could not overcome the weight of the defendant physicians’ argument on summary judgment that they were public employees (and that they were thus immune). Under that circumstance, Waisbren realized that he would then only have had the doctors’ employer, UMass. Medical, to proceed against. However, because the Defendant had failed beforehand to have timely submitted a presentment letter notifying the doctors’ public employer of the Plaintiffs claims as required by G.L.c. 258, §4, Waisbren knew that such an action would be barred as a matter of law. Waisbren came up with the excuse as to the alleged certainty of eventually losing on the merits and the prospect of judicial sanctions for the defendant doctors’ legal fees and expenses to cover for his failure to have protected all of Lingis’s options and to respect her desire to have a trial, even if the odds were against her ultimately prevailing.[2]
As to the standard of care issue, the Plaintiff presented credible expert testimony that Waisbren breached the standard of care by (a) failing to serve a presentment letter; (b) failing to have opposed the motion for summaiy judgment because, in the expert’s judgment, there was a substantial basis to prevail on a theory that the defendant physicians were independent contractors and not employees; and (c) failing to obtain the Plaintiffs consent to the case’s dismissal.
From her testimony and demeanor at trial, it is clear that Lingis was profoundly shaken and physically distressed by Waisbren’s dismissal of the case without her approval.
CHAPTER 93A STANDARDS IN THE LEGAL MALPRACTICE CONTEXT
“[A] practice or act will be unfair under G.L.c. 93A, §2, if it is (1) within the penumba of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury [ ].” Morrison v. Toys “R” Us, Inc., 441 Mass. 451, 457 (2004), quoting Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408 (1991). “In determining whether an act or practice is deceptive, ‘regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have [on the alleged injured party],” Leardi et al. v. Brown, 394 Mass. 151, 156 (1985), quoting P. Lorillard Co. v. FTC, 186 F.2d 52, 58 (4th Cir. 1950). Further, “technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice.” Leardi, 394 Mass. at 159, quoting Baldassari v. Public Fin. Trust, 369 Mass. 33, 41 (1975).
In deciding whether a certain practice is “unfair” under G.L.c. 93A, “the nature of [the] challenged conduct and the purpose and effect of that conduct [are] the crucial factors ...” Massachusetts Employers Insurance Exchange v. Propac-Mass., Inc., 420 Mass. 39, 42-43 (1995).
Where legal malpractice is at issue, to recover under 93A Lingis must prove more than a finding of “mere negligence.”[3] Davaris v. Petros, 442 Mass. 274, 278 (2004), citing with approval, Poly v. Moylan, 423 Mass. 141, 151 (1996), for the additional proposition that “negligent representation by an attorney did not violate G.L.c. 93A, where the attorney ‘did not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.’ ”
Thus, the question before the Court is whether Lingis proved by a preponderance of the evidence that Waisbren committed unfair and deceptive acts that involved elements of dishonesty, fraud, deceit or misrepresentation. See Meyer v. Wagner, 429 Mass. 410, 423 (1999). I find and rule that she did.
APPLICATION OF 93A TO THE FACTS OF THE CASE
While, as just noted, the Defendant’s mere negligence is not actionable under 93A, a record of compounded negligence can support reasonable inferences of intentional or reckless deceit if other circumstances are present. Here, a list of the Defendant’s acts that together established egregious professional negligence include:
Naming the wrong parties in the complaint in the Original Action.
Failing to serve a presentment letter on the “executive authority” of the physician defendants’ employer in order to preserve a cause of action against the Commonwealth in the event it were determined that the physician defendants were “public employees” under G.L.c. 258, §§1 and 2.
Failure to have attended the Medical Malpractice Tribunal personally to argue the merits of the malpractice claim and, instead, to have sent an associate unfamiliar with the facts of the case.
Failure to have taken any discoveiy of substance on material issues, including but not limited to depositions of the physician defendants as to the quality of care they provided and as to the details of their employee v. independent contractor status at UMass Medical. This was especially indefensible when Waisbren was faced with a summaiy judgment motion on the defendant physicians’ status and — having taken no prior discovery on the *443 issue — Waisbren chose to forego the opportunity to obtain it through Rule' 56(f).
Failure to have opposed the physician defendants’ motions for summary judgment without testing the factual basis of their claims to public employee status, especially in light of the Waisbren’s trial testimony as to his strong personal belief that Lingis could, in fact, have prevailed on that issue at summary judgment.
His conclusion at the time of being served with the physician defendants’ summary judgment motions that his act of opposing them would, with virtual certainty, provide the basis for sanctions to be assessed against the Plaintiff at the conclusion of the case. [1]
And most fundamentally, Waisbren’s failure to have obtained the Plaintiffs consent before dismissing her claim with prejudice.
What converts the tableau' of Waisbrén’s conduct, that in mulitple respects was measurably below the standard of the average qualified lawyer practicing the medical malpractice specialty in the 1997-2001 period, into unfair and deceptive acts, under c. 93A, §9 is the deceit implicit in the Defendant’s dismissal of Lingis’s claim (a) by not obtaining her consent but then falsely asserting that he had done so and (b) by giving the Plaintiff the false story as to why in February 2001 he believed that she had no case. .
As to the latter, the reason the\ Defendant had no case at that juncture was the Defendant’s own failure to have developed the facts of the physician defendants’ public employment status and his failure to have preserved the alternative avenue of relief against the Commonwealth by the timely filing of a presentment letter with regard to the Plaintiffs claim.
Moreover, the manifest deliberateness of the Defendant’s deceitful conduct (extending even to his testimony at trial) comprised a knowing and willful violation of c. 93A. See Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 680-81 (1986).
DAMAGES
Lingis is “entitled to recover for all losses which were the foreseeable consequences of the defendant’s unfair or deceptive act or practice.” Hopkins v. Liberty Mutual Ins. Co., 434 Mass. 556, 567, n.17 (2001), quoting DiMarzo v.Am. Mut. Ins. Co., 389 Mass. 85, 101 (1983).
In addition to damages for her strictly financial loss, I find and rule that Lingis is entitled to damages for the emotional distress intentionally caused by Waisbren under the standards of Haddad v. Gonzalez, 410 Mass. 855 (1991). Waisbren knew or, certainly, should have known that emotional distress was the likely result of his conduct. Further, his deliberate and calculated ignoring of his client’s interest and subsequent attempt to deny that, he had done so were extreme and outrageous. Waisbren’s actions caused Lingis’s entirely foreseeable acute and severe emotional distress. Thus, all the elements of the intentional infliction of emotional distress were proved. Simon v. Soloman, 385 Mass. 91, 95 (1982). Haddad, 410 Mass. at 871-72.[4]
I find the Plaintiff suffered emotional distress damages in the amount of $100,000.
I further find that Lingis suffered damages in the amount of the $3,500 non-refundable deposit she advanced to the Defendant, as well as any for such costs that were advanced to the Defendant. Because the record is not clear on the extent of such costs, the Plaintiff shall submit an affidavit with regard to the same within 14 days of the entry of this decision. If the Defendant contests the contents of the affidavit, a hearing will be held. Defendant shall notify the Court within 14 days of the entry of the Plaintiffs affidavit whether he seeks an evidentiary hearing on the issue.
With a violation of c. 93A, §9 having been established, the Plaintiff is entitled to attorneys fees as part of her damages.
Multiple Damages
93A multiple damages are reserved for particularly egregious conduct. “(The statute] ‘ties liability for multiple damages to the degree of the defendant’s culpability by creating two classes of defendants.’ Those defendants who have committed ‘relatively innocent violations’ of the statute are not liable for multiple damages, while a second class of defendants who have committed ‘willful or knowing’ violations are.” DataComm Interface v. ComputerWorld, Inc. et al., 396 Mass. 760, 779 (1986). For these purposes, a “willful or knowing” violation is one where either the defendant affirmatively knew that a material representation was false or that the defendant made the representation with reckless disregard of its truth or falsify. See Shaw v. Rodman Ford Truck Center, Inc., 19 Mass.App.Ct. 709, 711-12 (1985). See also Anthony’s Pier Four, Inc. v. HBC Associates et al., 411 Mass. 451, 475 (1991).
Waisbren’s deceit was willful and knowing by these standards, and thus Lingis’s damages will be trebled.
ORDER
I find by a preponderance of the evidence that the Defendant violated c. 93A, §9 by dishonestly and fraudulently deceiving the Plaintiff and misrepresenting material facts to her. The Plaintiff suffered emotional distress damages of $100,000 and is entitled to her attorneys fees as part of her damages. Further, I find and rule that such acts were willful and intentional, thus making the trebling of such damages (less attorneys fees) she sustained appropriate. The Plaintiff shall file an affidavit within 14 days of the entry of this order as to all costs and expenses sustained by her. The Defendant may request an evidentiary hearing on such costs and expenses within 14 days of the entry of the Plaintiff s affidavit.

 In his trial testimony Waisbren did not reconcile his confidence in the trial court’s likely denial of the defendant *444 physicians’ summary judgment motion with his certainty as to the prospect of the trial court’s later imposing sanctions for Lingis pursuing a merttless claim.

 Waisbren’s underlying confidence, in fact, in the malpractice claim was suggested by his trial testimony, as noted above, to the effect that — to the date of the trial — he strongly believed that he could have prevailed at summary judgment. Further, it is not clear how, in any event, Waisbren could have been so certain that at trial Lingis would have lost because of the defendant doctors’ immunity as public employees because Waisbren had taken no discovery on the issue.

 ‘To prevail on a claim of negligence by an attorney, a client must demonstrate that the attorney failed to exercise reasonable care and skill in handling the matter for which the attorney was retained.” Colucci, 25 Mass.App.Ct. 107, 111 (1987). “An attorney who has not held himself out as a specialist owes his client a duty to exercise the degree of care and skill of the average qualified practitioner.” Fishman v. Brooks, 396 Mass. 643, 646 (1986). Here, as noted, the Defendant did hold himself out as a specialist. But under either standard, his conduct fell below the benchmark.

 The factual record would also support a finding that emotional distress damages are appropriate for negligent infliction of emotional harm. Although there was not expert testimony on the “objective symptomatology,” Payton v. Abbott Labs, 386 Mass. 540, 557 (1982), of her distress, the Plaintiffs testimony and demeanor satisfies the Court without doubt that she suffered (and exhibited in the courtroom) severe emotional distress with tangible and palpable physical manifestations. Sullivan v. Boston Gas Company, 414 Mass. 129, 137-40 (1993). There was more than sufficient evidence to corroborate the genuineness of the Plaintiffs emotional distress that was the direct product ofWaisbren’s negligence. Id, at 138.